# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | |
|---|---|
| BELK, INC., | |
|       Plaintiff, | Case No. _____ |
| v. | |
| NIR PATEL, TIM MAY, and GAMESTOP CORP., | **JURY TRIAL DEMANDED** |
|       Defendants. | |

## **COMPLAINT**

Plaintiff Belk, Inc. ("Belk") submits this Complaint against defendants Nir Patel, Tim May, and GameStop Corp. ("GameStop") and hereby alleges as follows:

## **NATURE OF THE ACTION**

1.      Belk brings this action to enjoin its former CEO, Nir Patel, from his blatant, ongoing violations of his nonsolicitation obligations under his contracts with Belk.  Belk also seeks to enjoin its former SVP of Supply Chain, Tim May, from unlawfully possessing, using, or disclosing Belk's confidential information, which May stole from Belk prior to his departure from the company in August 2022, and which he would inevitably use at GameStop, his current employer, if he were allowed to continue working for GameStop.  Belk further seeks to enjoin GameStop, which is also Patel's current employer, from tortiously interfering with Patel's nonsolicitation obligations and from possessing, using, or disclosing Belk's confidential information.

2.     Belk is a department store chain with retail locations across the United States. Patel served as Belk's CEO until May 2022, when he resigned from Belk and accepted a position as GameStop's COO. Shortly thereafter, Patel commenced a campaign to solicit some of Belk's most senior employees to resign from Belk and join him at GameStop—despite the fact that Patel had agreed, for a period of twelve months after his departure from Belk, not to solicit, recruit, or hire Belk's employees. Patel's conduct is in direct violation of his nonsolicitation obligations to Belk.

3.     Patel did not undertake these efforts alone. His new employer, GameStop, actively assisted and encouraged Patel's unlawful solicitation, despite the fact that, upon information and belief, GameStop was aware of Patel's nonsolicitation obligations to Belk. Indeed, some of GameStop's most senior management personnel, including its CEO and Chairman, aided and abetted Patel's wrongful recruitment efforts, by directly contacting and recruiting senior Belk employees on Patel's behalf. GameStop's conduct constitutes tortious interference with Patel's contracts with Belk, as well as unfair and deceptive trade practices.

4.     Worse, one of the former Belk employees that Patel and GameStop poached, Tim May, stole confidential employee compensation information shortly before his departure from Belk. In the weeks leading up to his resignation from GameStop, May repeatedly sent to his personal email address documents containing confidential compensation information for hundreds of Belk employees, including all employees who reported directly to May while he was at Belk. Such information is, of course, invaluable to Patel and GameStop in their scheme to raid Belk's employees, by enabling them to tailor their offers to match or exceed the current compensation of any Belk employees whom they attempt to solicit.

5.     Although Belk's investigation remains ongoing, and the full extent of May's wrongdoing is not yet clear, May's intentions in repeatedly stealing Belk's confidential employee

information are clear: May undoubtedly intends to use that information to assist Patel and GameStop in their continuing unlawful campaign to raid Belk's senior ranks. May's conduct is in breach of his contractual confidentiality obligations to Belk and constitutes theft of trade secrets in violation of federal and North Carolina law and further constitutes unfair and deceptive trade practices.

6. Defendants' wrongful conduct, unless restrained and enjoined, will cause irreparable injury to Belk's business. Accordingly, Belk brings claims against Defendants for violation of the Defend Trade Secrets Action, violation of the North Carolina Trade Secrets Protection Act, breach of contract, tortious interference with contract, and unfair and deceptive trade practices, and seeks injunctive relief barring Defendants from continuing their illegal activities.

## PARTIES

7. Plaintiff Belk is a Delaware corporation with a principal place of business in Charlotte, North Carolina. Belk is a department store chain that sells apparel, shoes, home goods, and other accessories online and in hundreds of retail locations around the United States.

8. Upon information and belief, defendant Nir Patel is a citizen of North Carolina. Until approximately May 27, 2022, Patel was Belk's Chief Executive Officer. Patel is currently GameStop's Chief Operating Officer.

9. Upon information and belief, defendant Tim May is a citizen of Virginia. Until August 2, 2022, May was Belk's Senior Vice President of Supply Chain. Upon information and belief, May is currently employed by GameStop.

10.     Defendant GameStop Corp. is a Delaware corporation with a principal place of business in Grapevine, Texas.  GameStop is a multichannel video game, consumer electronics, and services retailer, with locations across the United States and elsewhere.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over Belk's federal claim pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836.  The Court has supplemental jurisdiction over Belk's state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in the Western District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL BACKGROUND

### I.     DEFENDANTS' NONSOLICITATION AND CONFIDENTIALITY OBLIGATIONS.

#### A.     Patel's Nonsolicitation Covenant.

13.     Patel joined Belk in October 2016 as Executive Vice President, General Merchandise Manager.  In July 2021, Belk promoted Patel to Chief Executive Officer.

14.     In connection with his promotion to CEO, Patel entered into a Cash Long-Term Incentive Plan Participation Agreement with Belk (the "LTIP Agreement").  (A copy of the LTIP Agreement is attached hereto as Exhibit 1.)

15.     Under the LTIP Agreement, the parties agreed that Patel would be eligible to receive certain incentive bonuses pursuant to the terms and conditions of the Belk, Inc. Cash Long-Term Incentive Plan (the "Plan").  In exchange for the right to receive this compensation, Patel agreed in the LTIP Agreement that he was "subject to each of the Plan's terms and conditions," including specifically "the restrictive covenants set forth in Section VI of the Plan."  Ex. 1 § 1.

4

16.     Section VI of the Plan includes, among other things, a covenant not to solicit Belk employees and other service providers.  (A copy of the Plan is attached hereto as Exhibit 2.) Specifically, section 6.3(b) of the Plan provides that during Patel's period of employment with Belk, and for the 12-month period immediately following the termination thereof (the "Restricted Period"), Patel:

> [S]hall not, directly or indirectly, on [his] own behalf or on behalf of any other Person … solicit, recruit or hire, or attempt to solicit, recruit or hire, any individual who is at the time of, or was within the one-year period immediately preceding, such actual or attempted solicitation, recruitment or hiring, an employee … of the Belk Group.

Ex. 2 § 6.3(b) (the "Nonsolicitation Covenant").  Moreover, Patel agreed that in the event of any breach of the Nonsolicitation Covenant, "such restrictive covenant shall be extended by a period of time equal to the period of such violation."  *Id.* § 6.7.

17.     Patel also acknowledged that the Nonsolicitation Covenant was "necessary for the reasonable and proper protection of the Belk Group" and that:

> [I]n the event of [ ] a breach or threatened breach [of the Nonsolicitation Covenant], in addition to any remedies at law, the members of the Belk Group shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages or the posting of a bond or other security.

*Id.* §§ 6.5, 6.9.

18.     Patel further agreed to "reimburse the members of the Belk Group for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the Restrictive Covenants," including the Nonsolicitation Covenant.  *Id.* § 6.5.

**B.     May's Nondisclosure Agreement.**

19.     May joined Belk in April 2018 as a Director, and was eventually promoted to SVP of Supply Chain in May 2022.  In that role, May had access to confidential information concerning

5

Belk's employees, including personal, financial, and employment information. Accordingly, Belk and May entered into a Management and Human Resources Non-Disclosure Agreement (the "Nondisclosure Agreement"). (A copy of the Nondisclosure Agreement is attached as Exhibit 3.)

20. Under the Nondisclosure Agreement, May agreed, among other things, (i) "to treat Confidential Information … with care in a way to ensure its confidentiality"; (ii) "to only access Confidential Information as appropriate to [his] job responsibility and only as necessary to perform job duties"; and (iii) "to not use, disclosure, publish, or otherwise share Confidential Information outside of Belk." Ex. 3 §§ 3-4, 6. May also acknowledged that if he breached the Nondisclosure Agreement, "Belk will be irreparably harmed" and that, "in addition to any other remedy, Belk shall be entitled to recover all expenses incurred in enforcing [the agreement], including attorneys' fees and court costs, and to a preliminary and permanent injunction enjoining such breach." *Id.* § 7.

## II. PATEL LEAVES BELK TO JOIN GAMESTOP AND RECRUITS OTHER BELK EMPLOYEES TO FOLLOW HIM.

21. In May 2022, Patel resigned from Belk to join GameStop as its COO. Under the Nonsolicitation Covenant, therefore, Patel was prohibited from "directly or indirectly" soliciting, recruiting, or hiring any Belk employees, or attempting to do so, until at least May 2023.

22. Nonetheless, in or about June 2022, Patel, with assistance from several other GameStop officials, embarked on a campaign to lure May and other senior Belk employees to GameStop, in breach of his Nonsolicitation Covenant.

### A. Patel's Solicitation of May.

23. In early June 2022, Patel commenced his efforts to solicit May to join GameStop, enlisting other senior GameStop representatives in the process. Among such other unlawful

solicitation as discovery may reveal, on June 9, 2022, GameStop Chief Executive Officer Matthew Furlong wrote an email to May, stating:

> My name is Matt Furlong and I am the CEO at GameStop. I wanted to reach out to introduce myself and ask whether you would be up for an intro call in the coming days. We are looking for strong operators to deliver on our vision, and I understand you may be a good fit for what we are building.

24. Furlong had no prior relationship or experience with May, and Furlong's "understanding" that May would be a "good fit" was undoubtedly based on conversations Furlong had with Patel. Furlong was therefore acting at Patel's direction and on Patel's behalf when he contacted May concerning potential employment with GameStop. Patel's enlistment of Furlong to recruit May was in violation of Patel's covenant not to "indirectly" solicit or recruit any Belk employees during the Restricted Period.

25. On July 19, 2022, Furlong again emailed May, copying GameStop's Chairman, Ryan Cohen, and GameStop Board member Alan Attal, in order to introduce them to May. Furlong's email stated that he and May "had a good initial discussion," and that Furlong "thought it would be great for [Cohen and Attal] to connect [with May] as well." Once again, upon information and belief, Furlong was acting at Patel's direction in introducing May to other senior GameStop officers, in an effort to recruit him.

26. Also on July 19, 2022, Patel met with May directly via videoconference. Based on Furlong's statement that same day that he had only engaged in "initial discussion[s]" with May, it is apparent that May had not yet accepted a position with GameStop, and that Patel had arranged the July 19 meeting with May in an effort to persuade him to take the GameStop job.

27. Patel and May met for nearly thirty minutes on the evening of July 19. May's corporate emails confirm that both participants joined the meeting at approximately 6:30 p.m. and left shortly before 7 p.m.:

From: Nir Patel <NirPatel@gamestop.com>
Sent on: Wednesday, July 20, 2022 3:13:32 AM
To: Nir Patel <NirPatel@gamestop.com>; Tim May <Tim_May@belk.com>
Subject: Meeting (AdHocMeeting)/Thread Id: 19:meeting_MTA5NWFjZTktNTBlY

Start Time (UTC): 7/19/2022 6:30:31 PM
End Time (UTC): 7/19/2022 6:57:29 PM
Duration: 00:26:57.7748134

[7/19/2022 6:31:10 PM (UTC)] NirPatel@gamestop.com joined.
[7/19/2022 6:57:27 PM (UTC)] NirPatel@gamestop.com left.
[7/19/2022 6:30:31 PM (UTC)] Tim_May@belk.com joined.
[7/19/2022 6:57:29 PM (UTC)] Tim_May@belk.com left.

28.     Based on the timing and length of the meeting, its purpose plainly was to enable Patel to solicit, recruit, and hire May at GameStop.  Patel's direct solicitation of May at this meeting was an additional violation of the Nonsolicitation Covenant.

29.     Patel's unlawful recruitment efforts ultimately proved successful.  Shortly after his July 19 meeting with Patel, May made the decision to resign from Belk and join Patel at GameStop. In a July 22, 2022 email, just days after May's meeting with Patel, Cohen (the Chairman of GameStop's Board of Directors) wrote to May, stating that he "look[ed] forward to working together," thereby confirming May's decision to defect from Belk.

30.     GameStop wrongfully induced, approved, and benefitted from Patel's breaches of the Nonsolicitation Covenant.  Upon information and belief, GameStop was aware of Patel's Nonsolicitation Covenant when GameStop hired him as its COO.  GameStop nevertheless encouraged and assisted Patel in recruiting May and directly participated in crafting the details of May's offer of employment.  In a July 28, 2022 email, for example, Furlong wrote to May that the company was "eager to have [May] to join our team" and that GameStop VP of Human Resources, Wes Burke, was working "on finalizing the details of [May's] offer." Other members of GameStop's senior leadership similarly approved and ratified Patel's wrongful conduct, including Board members Cohen and Attal, who corresponded and met with May in mid-July to interview him, and again met with him on August 4 by videoconference to discuss his future employment

with GameStop. GameStop's active participation in Patel's breaches constitutes tortious interference with the Nonsolicitation Covenant.

**B.    Patel Attempts To Poach Belk's HR Group Vice President.**

31.    May was not the only target of Patel's wrongful solicitation. In fact, Patel recently sought to induce Belk's GVP of HR Shared Services and Total Rewards, Phillip Burke, to resign from Belk and join GameStop.

32.    On June 30, 2022, Burke received a LinkedIn message from GameStop Senior Recruiter Kathy Akers. Akers' message stated that she was assisting GameStop in "hand picking individuals who will help drive [the company] forward," and she believed Burke was "someone who may be interested in chatting about Gamestop." Based on Patel's contemporaneous efforts to wrongfully solicit other senior Belk employees, and Patel's prior experience and professional relationship with Burke, Akers undoubtedly "hand-picked" Burke at Patel's direction.

33.    Burke agreed to meet with GameStop's Wes Burke by videoconference on July 11, 2022. During that meeting, Wes Burke told Phillip Burke that GameStop was looking for someone to lead and "modernize" its Total Rewards department, which was responsible for GameStop's employee compensation. Wes Burke stated that GameStop's HR department was "not well respected" and that GameStop was in search of a senior manager to help rebuild that department and improve its image within the company.

34.    Wes Burke also candidly admitting during the meeting that GameStop's efforts to recruit Phillip Burke were done at Patel's direction, explaining that Patel had "said to reach out to [Phillip Burke] and see if [he] would be interested in the job." Although Phillip Burke ultimately informed GameStop that he was not interested, Patel's efforts to recruit him through Wes Burke were in further breach of Patel's covenant not to "indirectly" solicit or attempt to solicit Belk's employees during the Restricted Period.

9

### III. MAY STEALS BELK'S CONFIDENTIAL EMPLOYEE INFORMATION IN ORDER TO ASSIST PATEL'S AND GAMESTOP'S ILLEGAL RECRUITING EFFORTS.

35. On August 1, 2022, after Patel successfully solicited and recruited May to join GameStop, May resigned from Belk. When Belk asked May to identify his new employer, however, he initially refused. In fact, Belk—suspecting that Patel may have been behind May's sudden departure—specifically asked May whether he was leaving to join GameStop. Only when pressed repeatedly did May finally admit that he had accepted employment with GameStop.

36. The reasons for May's evasiveness would soon become clear. After May's resignation, it came to light that he had for weeks been secretly sending confidential Belk employee compensation information to his personal email address.

37. On June 15, 2022, for example—less than a week after GameStop had initially solicited him—May sent to his personal email account a spreadsheet titled "Copy of Belk Active Associates - Tim May.v2 (003).xlsx." That spreadsheet contains detailed employment information for approximately 70 Belk employees, including several managers, along with their total annualized base pay, car and mobile device allowances, and bonus information. Several weeks later, on July 11, 2022—just as GameStop and Patel were ramping up their recruiting efforts and May was in discussions with senior GameStop representatives—May again sent to his personal email address a revised version of the same spreadsheet, including a new column identifying each employee's manager. Finally, on July 18, 2022—the day before Patel's meeting with May and in anticipation of May's imminent departure from Belk—May sent to his personal email account another spreadsheet titled "Copy of Roster 7.11.11.xlxs" containing even more detailed compensation information for Belk's employees. That spreadsheet contains, among other things, thousands of cells of confidential employee data, including names, hiring dates, job titles, and compensation information for hundreds of Belk employees. The spreadsheet also contains a

10

separate tab identifying the Belk employees from the "Active Associates" spreadsheets, including all employees who reported directly to May, along with their annual compensation.

38.     Given the timing of May's covert emails to his personal account, May's intentions in taking Belk's confidential employee information are clear: May intended to provide the information to Patel and GameStop to help them wrongfully recruit additional employees from Belk, including the employees who directly reported to May and with whom May developed relationships while employed by Belk.

39.     The information May stole is highly valuable to Patel and GameStop in their campaign to target and solicit Belk's employees.  Because the stolen information contains details as to each employee's compensation, including annual salary and bonus information, Patel and GameStop can use that information to present more attractive or lucrative compensation packages to any Belk employees they wish to target.

40.     There is no legitimate business reason for May to send Belk's confidential employee compensation information to his personal email account.  None of May's duties at Belk required him to have access to that information from his personal accounts.

41.     May was well aware of his obligations to keep Belk's compensation information confidential.  On August 3, 2022, for example, Belk's GVP of Human Resources, Jackie Sheets, emailed May an exit package containing, among other things, a copy of the Nondisclosure Agreement.   In her email, Sheets specifically stated that the Nondisclosure Agreement was enclosed "as a reminder of [May's] confidentiality obligations" to Belk.  In addition, in connection with May's departure, Belk's GVP and Legal Counsel, Nicole Ramsdell, specifically reminded May in writing on August 2, 2022 of his "obligation to treat Belk business information as confidential, as well as any associate or customer information."  Nonetheless, May did not disclose

11

that he secretly and repeatedly emailed himself Belk's confidential employee compensation spreadsheets and that he remains in possession of some of Belk's most confidential trade secrets.

42.    May's conduct is in violation of his obligations under the Nondisclosure Agreement, which requires him, among other things, "to only access Confidential Information as appropriate to [his] job responsibility and only as necessary to perform job duties." Further, May's conduct shows that he intended to share Belk's confidential information with Patel and GameStop to help them solicit and hire additional Belk employees, in breach of his agreement "to not use, disclose, publish, or otherwise share Confidential Information outside of Belk."

43.    The employee compensation data May misappropriated are trade secrets. This information derives independent commercial value from not being generally known because, among other things, it represents Belk's internal assessment of the value of its employees. Should this information be made public, Belk's competitors and other companies would be able to solicit its employees at slightly higher compensation rates, causing Belk to lose valuable personnel. Belk therefore derives significant economic value by virtue of keeping this information secret.

44.    Belk took reasonable efforts to maintain the secrecy of its employee compensation information. Among other things, Belk restricts access to that information only to a limited set of employees on a need-to-know basis. In addition, Belk requires all employees with access to its compensation information to enter into Nondisclosure Agreements, and requires departing employees to return company assets such as laptops and mobile devices on which that information may be stored.

## IV.    BELK IS SUFFERING IRREPARABLE HARM.

45.    Defendants' wrongful conduct, unless enjoined, will irreparably harm Belk. By unlawfully soliciting Belk's employees in an industry where human capital and talent are crucial, Defendants are harming and will continue to harm Belk's business. The individuals Patel has

targeted, for example, are among Belk's most senior employees. These employees have worked for Belk for many years, and Belk has invested significant time and resources over the years training them and developing them professionally.

46. Patel's wrongful solicitation is not an isolated incident. Rather, Patel's and GameStop's repeated efforts to recruit Belk's senior management are part of a coordinated raid on Belk's key employees. It is therefore clear that, unless enjoined, Patel will continue to violate his nonsolicitation obligations and cause continuing, irreparable harm to Belk. Further, as evidenced by its prior assistance in Patel's wrongful recruitment efforts, it is apparent that GameStop, unless enjoined, will continue aiding and abetting Patel's unlawful conduct, thereby contributing to the harm Belk is suffering.

47. May's illegal conduct similarly demonstrates that, unless restrained and enjoined, May will misuse Belk confidential information and assist Patel and GameStop in unlawfully soliciting Belk's employees. Based on the circumstances under which May misappropriated Belk's confidential compensation information—throughout his discussions with Patel and GameStop concerning potential employment, up to the time he decided to defect to GameStop—May plainly intends to use Belk's confidential information, and share it with GameStop, to help Patel and GameStop wrongfully solicit additional Belk employees, including those whose compensation information May stole.

48. Belk is therefore suffering significant and irreparable injury as a result of Defendants' conduct. If Belk loses additional employees as a result of Defendants' misconduct, that harm will continue to grow.

**COUNT I: VIOLATION OF THE DEFEND TRADE SECRETS ACT**
**(Against May)**

49. Belk incorporates the foregoing allegations by reference.

13

50.     May has violated the Defend Trade Secrets Act.  Belk owns and possesses trade secrets and other confidential and proprietary information, including the employee compensation information that May stole.  Belk took reasonable measures to safeguard the confidentiality of this information, including by restricting access to that information, requiring all employees with access to that information to sign Nondisclosure Agreements, and requiring departing employees to return all company devices on which confidential information might be stored.

51.     May misappropriated Belk's trade secrets.  May acquired Belk's confidential employee information under circumstances giving rise to a duty to maintain its secrecy and limit its use.  Nonetheless, May transmitted that information to his personal email account without Belk's authorization or consent, in order to maintain access to that information after his resignation from Belk so that he could improperly assist Patel's and GameStop's efforts to poach additional Belk employees.

52.     The trade secrets that May misappropriated are related to products and services used in interstate commerce because the employees whose compensation information May stole are located in different states, and they are responsible for Belk's interstate supply chain.

53.     If the Court does not enjoin May from using or disclosing Belk's confidential employee information, he will use that information for Defendants' benefit and to Belk's detriment, causing Belk irreparable harm.

54.     Belk has been damaged by May's conduct in an amount to be established at trial.

**COUNT II: VIOLATION OF THE NORTH CAROLINA TRADE SECRETS
PROTECTION ACT
(Against May)**

55.     Belk incorporates the foregoing allegations by reference.

56.     May has violated the North Carolina Trade Secrets Protection Act.  Belk owns and possesses trade secrets and other confidential and proprietary information, including the employee

14

compensation information that May stole. Belk took reasonable measures to safeguard the confidentiality of this information, as set forth above.

57. May willfully and maliciously, and acting in bad faith, misappropriated Belk's trade secrets by transmitting Belk's confidential employee information to his personal email account without Belk's authorization or consent. May did so in order to maintain access to Belk's confidential information following his departure from the company and to help Patel and GameStop continue their illegal poaching of Belk's employees.

58. If the Court does not enjoin May from using or disclosing Belk's confidential employee information, he will use that information to Defendants' benefit and to Belk's detriment, causing Belk irreparable harm.

59. Belk has been damaged by May's conduct in an amount to be established at trial.

## COUNT III: UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Against May)

60. Belk incorporates the foregoing allegations by reference.

61. May's actions are in and affecting commerce in North Carolina and are unfair and deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1.

62. The acts and conduct of May as alleged constitute unfair competition under North Carolina common law, including without limitation, May's illegal taking of Belk's confidential information regarding employee compensation.

63. May's acts and conduct have been willful, reckless, wanton, egregious, unfair, unethical, deceptive, and unscrupulous.

64. May's acts and conduct as alleged above cause and continue to cause damage to Belk, including to its goodwill and reputation, and results in losses to Belk and illicit gain by May in an amount which is unknown at the present time.

15

65. As a direct and proximate result of May's improper action and unfair competition as set forth herein, Belk has suffered and continues to suffer damages, and is entitled to monetary and injunctive relief pursuant to N.C. GEN STAT § 75 *et seq.*, as well as attorneys' fees and costs pursuant to N.C. GEN. STAT. § 75-16.1, and treble damages pursuant to N.C. GEN. STAT. 75-16, all in amounts to be proved at trial.

## COUNT IV: BREACH OF CONTRACT
### (Against May)

66. Belk incorporates the foregoing allegations by reference.

67. May entered into the Nondisclosure Agreement, a valid and binding contract, with Belk.

68. Belk has performed its obligations under the Nondisclosure Agreement.

69. May breached the Nondisclosure Agreement by, among such other acts as discovery may reveal, transmitting Belk's confidential employee information to his personal email account, in order to assist Patel's and GameStop's efforts to wrongfully poach Belk's employees.

70. May's breaches of the Nondisclosure Agreement have caused injury to Belk and, absent injunctive relief, will irreparably harm Belk.

71. Belk has been damaged by May's breaches in an amount to be established at trial.

## COUNT V: BREACH OF CONTRACT
### (Against Patel)

72. Belk incorporates the foregoing allegations by reference.

73. Patel entered into the LTIP Agreement and the Plan, a valid and binding contract, with Belk.

74. Belk has performed its obligations under the LTIP Agreement and the Plan.

16

75.     Patel breached the LTIP Agreement and the Plan, including specifically the Nonsolicitation Covenant, by, among such other acts as discovery may reveal, soliciting, recruiting, and hiring May on behalf of GameStop, and by attempting to solicit, recruit, and hire Phillip Burke, in each case when such individuals were employees of Belk.

76.     Patel's breaches of the LTIP Agreement and the Plan have caused injury to Belk and, absent injunctive relief, will irreparably harm Belk.

77.     Belk has been damaged by Patel's breaches in an amount to be established at trial.

## COUNT VI: TORTIOUS INTERFERENCE WITH CONTRACT
### (Against GameStop)

78.     Belk incorporates the foregoing allegations by reference.

79.     The LTIP Agreement and the Plan constitute a valid and enforceable contract between Patel and Belk.

80.     GameStop knew or had reason to know of this contract between Patel and Belk. Upon information and belief, GameStop learned of Patel's contract with Belk, including specifically Patel's nonsolicitation obligations, when GameStop hired Patel as its COO in May 2022.

81.     GameStop, including through its CEO Matthew Furlong, Chairman Ryan Cohen, Board member Alan Attal, and VP of Human Resources Wes Burke, intentionally and without justification induced Patel to breach the Nonsolicitation Covenant, including by, among such other acts as discovery may reveal, facilitating and encouraging Patel's breaches and soliciting employees on Patel's behalf.  GameStop did so in order to wrongfully secure access to Belk's talent pool, in which Belk has invested significant time and resources training and developing.

17

82.     GameStop's tortious interference with the LTIP Agreement and the Plan, including specifically the Nonsolicitation Covenant, has caused injury to Belk and, absent injunctive relief, will irreparably harm Belk.

83.     Belk has been damaged by GameStop's conduct in an amount to be established at trial.

## COUNT VII: UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Against GameStop)

84.     Belk incorporates the foregoing allegations by reference.

85.     GameStop's actions are in and affecting commerce in North Carolina and are unfair and deceptive acts or practices in violation of N.C. GEN. STAT. § 75-1.1.

86.     The acts and conduct of GameStop as alleged constitute unfair competition under North Carolina common law, including, without limitation, GameStop aiding and abetting Patel's violations of his nonsolicitation obligations to Belk, including GameStop's senior representatives directly contacting and recruiting senior Belk employees on Patel's behalf, thereby tortiously interfering with Patel's contract with Belk.

87.     GameStop's acts and conduct have been willful, reckless, wanton, egregious, unfair, unethical, deceptive, and unscrupulous.

88.     GameStop's acts and conduct as alleged above cause and continue to cause damage to Belk, including to its goodwill and reputation, and have resulted in losses to Belk and illicit gain by GameStop in an amount which is unknown at the present time.

89.     As a direct and proximate result of GameStop's improper action and unfair competition as set forth herein, Belk has suffered and continues to suffer damages, and is entitled to monetary and injunctive relief pursuant to N.C. GEN STAT § 75 *et seq.*, as well as attorneys' fees

18

and costs pursuant to N.C. GEN. STAT. § 75-16.1, and treble damages pursuant to N.C. GEN. STAT. 75-16, all in amounts to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Belk prays that the Court enter an order:

1.      Enjoining Patel from directly or indirectly soliciting, recruiting, or hiring any person that is (or during the immediately preceding one year period, was) an employee of any member of the Belk group of companies, or attempting to do any of the foregoing, in violation of the Nonsolicitation Covenant, and extending the Restricted Period by the duration of Patel's violations;

2.      Enjoining GameStop and May from encouraging, assisting, aiding, facilitating, or otherwise inducing Patel's actual or attempted solicitation, recruitment, or hiring of Belk's employees in violation of the Nonsolicitation Covenant;

3.      Barring May from being employed by, or performing any work for, GameStop, and barring GameStop from employing May or permitting May to perform any work for GameStop, in any capacity, directly or indirectly;

4.      Enjoining Defendants from using or disclosing Belk's confidential information;

5.      Requiring Defendants to return all Belk confidential information in their possession, custody, or control;

6.      Requiring Defendants to submit to a forensic examination, at their expense, of all hardware and other media that may contain Belk confidential information and to reimburse Belk for the costs of any forensic examination it has previously conducted of May's devices and accounts;

19

7.      Requiring Defendants to preserve all documents, devices, and equipment that could be relevant to the allegations in this complaint;

8.      Requiring Defendants to pay damages to Belk in an amount to be determined at trial, including punitive damages against May under the North Carolina Trade Secrets Protection Act;

9.      Trebling damages due to the willful, reckless, wanton, egregious, unethical, deceptive and unscrupulous conduct of GameStop and May pursuant to N.C. GEN. STAT. §§ 75-16 and 75-16.1;

10.     Awarding Belk its attorney fees and costs; and

11.     Granting all such other and further relief as the Court deems just and proper.

## JURY DEMAND

Belk demands a trial by jury for all causes of action and claims in this action that are triable by right to a jury.

Dated: August 22, 2022

Respectfully submitted,

/s/ *Jacob S. Wharton*

Jacob S. Wharton
N.C. Bar. No. 37421
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, North Carolina
Telephone: (336) 747-6609
Jacob.Wharton@wbd-us.com

Patrick G. Spaugh
N.C. Bar No. 49532
WOMBLE BOND DICKINSON (US) LLP
One Wells Fargo Center
Suite 3500
Charlotte, North Carolina
Telephone: (704) 331-4962
Patrick.Spaugh@wbd-us.com

*Attorneys for Belk, Inc.*

Of Counsel:

Robert B. Ellis, P.C. (*pro hac vice* application forthcoming)
Michael S. Biehl (*pro hac vice* application forthcoming)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
robert.ellis@kirkland.com
michael.biehl@kirkland.com

21