# Exhibit 2

# BELK, INC.
# CASH LONG-TERM INCENTIVE PLAN

## ARTICLE I
## ESTABLISHMENT AND PURPOSE

1.1 <u>Establishment</u>. Belk, Inc., a Delaware corporation (the "<u>Company</u>"), hereby establishes this long-term incentive compensation plan to be known as the "Belk, Inc. Cash Long-Term Incentive Plan" (this "<u>Plan</u>") for the benefit of employees and service providers of the Company and Subsidiaries (collectively, the "<u>Belk Business</u>"). This Plan shall become effective as of the date (the "<u>Effective Date</u>") of its adoption by the Company's board of directors (the "<u>Board</u>"). All costs related to the implementation and operation of the Plan shall be borne by the Company.

1.2 <u>Purpose</u>. This Plan is intended to promote the long-term growth and profitability of the Belk Business by providing a select group of key individuals with an opportunity to earn additional compensation based on individual performance and the performance of the Belk Group (as defined below) or segments thereof, thereby attracting and retaining key talent and encouraging such persons to contribute to, and participate in, the success of the Belk Group. Under this Plan, the Company may grant periodic Awards (as defined below) to such present and future employees and service providers of the Belk Business as may be selected in the sole discretion of the Administrator (as defined below) (such individuals, the "<u>Participants</u>").

## ARTICLE II
## DEFINITIONS

As used in this Plan, the following terms shall have the meanings set forth below:

2.1 "<u>Administrator</u>" means the Board or a committee of one or more individuals to whom the Board delegates its duties and authorities under this Plan.

2.2 "<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person.

2.3 "<u>Award</u>" means the amount, percentage of bonus pool, number of appreciation rights, or other compensation right granted to a Participant in accordance with the terms of this Plan and the Participation Agreement, as determined in the sole discretion of the Administrator with respect to each individual Participant. Awards (and the value of any Bonus Amounts with respect to Awards) are not guaranteed each year, and may vary from Participant to Participant based on the performance of the Belk Group or a specific office, practice group or business unit thereof, such Participant, or a combination thereof, pursuant to objective or subjective criteria selected by the Administrator in its sole discretion. The Administrator will notify each Participant of the amount or type of any Bonus Amount as soon as practicable after the applicable Testing Date.

2.4 "<u>Belk Group</u>" means Belk, Inc., a Delaware corporation, together with each of its direct and indirect Subsidiaries and controlled Affiliates.

2.5 "<u>Bonus Amount</u>" means an amount, whether in cash or other property, that a Participant may receive with respect to such Participant's Award, as determined in the sole discretion of the Administrator.

2.6 "Cause" means, except as otherwise set forth in a Participation Agreement applicable to a Participant, the occurrence of any of the following acts or omissions by the Participant, as determined by the Administrator: the Participant's: (a) commission of, indictment for, or conviction of, or plea of *nolo contendere* to, a felony under any state or federal law; (b) insubordination, misconduct, abandonment of role or negligence in performing services for any member of the Belk Group or any of its Affiliates; (c) violation of a material policy of any member of the Belk Group or any of its Affiliates; (d) a Restrictive Covenant Breach; or (e) refusal or failure to perform the Participant's duties to any member of the Belk Group or any of its Affiliates or to follow the lawful directives of the Board, the Belk Group's Chief Executive Officer or other applicable supervisor (other than as a result of death or physical or mental incapacity) that continues after notice from the Company.

2.7 "Code" means the United States Internal Revenue Code of 1986, as amended from time to time.

2.8 "EBITDA" means, unless otherwise determined by the Administrator, the consolidated net income before interest, taxes, depreciation, and amortization of the Belk Group for the applicable period (net of any bonuses for the applicable period), in each case, determined in accordance with United States generally accepted accounting principles using the methodologies used in preparing the financial statements of the members of the Belk Group, as adjusted to exclude the effect of any extraordinary expenses, income, gains, or losses; provided, that if, as of the time of determination of EBITDA, one or more members of the Belk Group is party to a credit agreement, "EBITDA" shall have the meaning set forth in such agreement (insofar as such credit agreement applies to one or more members of the Belk Group). In all cases, actual EBITDA and target EBITDA for any given period shall be compared on a "like for like" basis, such that if, after the Board has established the EBITDA target for a given year, one or more members of the Belk Group thereafter consummates (1) the acquisition of another business or (2) the disposition of an existing business, in such year, any EBITDA thresholds contemplated by this Plan shall be adjusted to reflect the change in EBITDA attributable to the acquired or disposed business, as determined by the Administrator.

2.9 "Fair Market Value" of the Belk Group or any one or more components thereof means the equity value of the Belk Group (or such relevant components thereof) as of the date of valuation as determined by the Administrator in its sole discretion.

2.10 "Participation Agreement" means a written agreement between the Company and an employee or service provider of the Company pursuant to which such individual becomes a Participant in this Plan, sets forth the Participant's Award, agrees to the be subject to the terms and conditions of this Plan, and that sets forth any additional terms or conditions that apply to the Participant.

2.11 "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, an association or other entity or a governmental entity.

2.12 "Plan Year" means each fiscal year commencing on the Saturday closest to February 1st and ending on the Saturday closest to January 31st, commencing with the fiscal year commencing on the Saturday closest to February 1, 2021, unless otherwise specified in a Participation Agreement.

2.13 "Qualifying Termination" means a Termination by the Company or any other member of the Belk Group without Cause, and where (i) such Termination occurs after the completion of the first fiscal quarter of the Plan Year in which such Termination occurs, and (ii) the Participant is eligible for severance under the Belk, Inc. Amended and Restated Severance Pay Plan.

2.14 "Restrictive Covenant Breach" means, with respect to a Participant, a breach in any material respect by such Participant of any restrictive covenant set forth in Article VI or in a Participation Agreement or of any other restrictive covenant between the Participant and any member of the Belk Group or any of its Affiliates.

2.15 "Service" means the continuous provision of material services to one or more members of the Belk Group as an employee or, if recognized by the Administrator in its sole discretion, as a service provider, whether as a consultant, independent contractor, leased or seconded employee, or otherwise.

2.16 "Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof.

2.17 "Termination" means, with respect to a Participant, a termination of his or her Service with the Belk Group. Approved temporary absences from Service because of illness, vacation, or leave of absence and transfers among members of the Belk Group shall not be considered Terminations, as long as they do not constitute a "separation from service" as defined in Section 409A of the Code. If a Participant (a) transfers Service to an Affiliate that is not a member of the Belk Group or (b) terminates Service with the Belk Group but continues to provide Service to the Belk Group as a non-employee director, officer, or consultant, such transfer or change in status shall be deemed a Termination if it is a "separation from service" as defined in Section 409A of the Code and, if such transfer or change in status is not a "separation from service" as defined in Section 409A of the Code, the Company shall have the discretion to treat the transfer or change in status as a Termination or to set payment of the Participant's Award in accordance with Section 409A of the Code.

2.18 "Testing Date" means, unless otherwise specified in a Participation Agreement, will be April 30 following the Plan Year.

## ARTICLE III
## ELIGIBILITY AND CONTRIBUTIONS

3.1 Eligibility; Awards. The Administrator may, from time to time, select the Participants who shall be eligible to participate in, and to receive an Award under, this Plan. The Administrator will determine each Award, which can be any amount, percent of bonus pool, number of appreciation rights, or other compensation right.

3.2 Bonus Amounts. The Administrator will determine the Participants, if any, who will receive a Bonus Amount as of each Testing Date, which Bonus Amount will be payable in accordance with the terms of the Participant's Participation Agreement. No Participant is guaranteed a Bonus Amount as of any Testing Date. The Administrator will determine the amount or type of the Bonus Amount each selected Participant may receive, which can be any amount or type determined in the Administrator's sole discretion. The Administrator will determine each Award, which can be any amount, percent of bonus pool, number of appreciation rights, or other compensation right.

3.3 Testing Date. Subject to the provisions of Article IV below, on each Testing Date, as long as a Participant has not had a non-Qualifying Termination prior to such Testing Date, the Company will

3
Case 3:22-cv-00428-MOC-DSC   Document 1-2   Filed 08/22/22   Page 4 of 12

determine the Bonus Amount, if any, earned by such Participant in accordance with the Participant's Participation Agreement.

## ARTICLE IV
## VESTING AND CANCELLATION UPON TERMINATION

4.1 <u>Service Requirement</u>. A Participant's Bonus Amount, if any, with respect to any Testing Date shall become vested and will be paid (i) 75% on the sixtieth (60th) day immediately following such Testing Date, so long as such Participant has not suffered a non-Qualifying Termination on or prior to such payment date and (ii) 25% on the sixtieth (60th) day immediately following the first anniversary of such Testing Date, so long as such Participant has not suffered a non-Qualifying Termination on or prior to such payment date.

4.2 <u>Cancellation Upon Non-Qualifying Termination</u>. Upon any non-Qualifying Termination of a Participant, such Participant will no longer be eligible to receive a payment with respect to such Participant's Bonus Amount or any portion thereof that has not been previously paid to such Participant prior to such Termination, unless otherwise determined by the Administrator in its sole discretion. The Company need not treat Participants identically.

4.3 <u>Qualifying Termination.</u> Notwithstanding any provision to the contrary in this Plan, if a Participant incurs a Qualifying Termination: (i) the Participant shall remain eligible to receive any earned but unpaid Bonus Amount with respect to the Plan Year preceding the Plan Year in which such Termination occurs [so long as a Restrictive Covenant Breach does not occur prior to the applicable payment date], and provided that any such payment(s) shall be pro-rated based on the number of full calendar weeks of the Plan Year in which such Termination occurs that preceded the Termination, and (ii) the Participant shall remain eligible to receive a Bonus Amount for the Plan Year in which such Termination occurs [so long as a Restrictive Covenant Breach does not occur prior to the applicable payment date], and provided that any such payments shall be pro-rated based on the number of full calendar weeks of the Plan Year in which such Termination occurs that preceded the Termination. Any payments pursuant to this <u>Section 4.3</u> will be rounded up to the nearest whole dollar.

## ARTICLE V
## PAYMENT OF BONUS AMOUNTS

5.1 <u>Payment</u>. Unless otherwise set forth in a Participation Agreement, all vested Bonus Amounts shall be paid in accordance with <u>Section 4.1</u>; <u>provided</u> that, if the vesting of the Participant's Bonus Amount is waived pursuant to <u>Section 4.2</u>, the payments will be designed to be exempt from or otherwise comply with Section 409A of the Code and will be conditioned upon the Participant having executed a full and effective release on such form as provided by the Company.

5.2 <u>Withholding</u>. The Company will withhold from any payment made under this Plan and from any amount taxable under the Code all applicable taxes and any and all other amounts required to be withheld under applicable law, regulation or guidance. In the event that the Company fails to withhold any taxes required to be withheld by applicable law or regulation, each Participant shall indemnify the Company for any amount paid by the Company with respect to such Participant with respect to any such taxes, together with any interest, penalty and/or expense related thereto.

# ARTICLE VI
# RESTRICTIVE COVENANTS

The Belk Group operates in a highly sensitive and competitive commercial environment. As part of a Participant's employment with, or Service to, the Belk Group (including prior to the date hereof), such Participant has been, and will continue to be, exposed to highly confidential and sensitive information regarding the business operations of the Belk Group. It is critical that the Belk Group take all necessary steps to safeguard its legitimate protectable interests in such information and to prevent any of its competitors or any other persons from obtaining any such information. Therefore, as consideration for the benefits provided in this Plan to such Participant, and unless otherwise set forth in a Participation Agreement, by the act of executing the Participation Agreement (and without any further action on the part of such Participant), each Participant hereby represents, warrants, acknowledges, agrees and covenants as follows:

6.1     Confidentiality and Non-Disclosure; Inventions and Other Intellectual Property.

(a)     Such Participant acknowledges that in the course of such Participant's employment with, or Service to, the Belk Group (including prior to the grant date), such Participant may create, have access to, become acquainted with, and/or possess Confidential Information (as defined below). Such Participant recognizes that such Confidential Information has been developed by the Belk Group, at great expense and is and shall remain the exclusive property of the applicable member of Belk Group. Such Participant agrees that, during the period of such Participant's employment with, or Service to, the Belk Group and thereafter, such Participant shall not, without the express written consent of the relevant member of the Belk Group, disclose to any Person, or use or otherwise exploit for such Participant's own benefit or for the benefit of any other Person, any of the Confidential Information, except as may be required in the course of such Participant's employment with, or Service to, the Belk Group. "Confidential Information" means the confidential and proprietary information of any member of the Belk Group.

(b)     On the date of such Participant's Termination, such Participant shall promptly return, to the relevant member of the Belk Group, any and all materials, documents, notes, manuals or lists in such Participant's possession or control that contain or embody Confidential Information, or relate directly or indirectly to the business of any member of the Belk Group.

(c)     Subject to Section 6.1(e), if such Participant is compelled by law to make any disclosure of Confidential Information, such Participant shall give the relevant member of the Belk Group prompt written notice thereof and shall provide the relevant member of the Belk Group with all reasonable assistance necessary to enable such member of the Belk Group to obtain a protective order or other assurance that such Confidential Information will be treated confidentially and not further disclosed.

(d)     Such Participant hereby agrees that all right, title and interest in and to all of such Participant's Discoveries and work product made or conceived during such Participant's period of employment and/or Service with the Belk Group related to or in furtherance of the interests or business of any member of the Belk Group (collectively, "Work Product") shall belong solely to the Belk Group (or its designee), regardless of whether such Discoveries or Work Product are protected or protectable under applicable patent, trademark, service mark, copyright or trade secret laws. For purposes of this Article VI, "Discoveries" means all inventions, designs, discoveries, improvements and works of authorship, including any information relating to the know-how, processes, designs, computer programs and routines, formulae, techniques or developments of the Belk Group or experimental work, work in progress, or business trade secrets made, conceived, or reduced to practice, by the Belk Group. Such Participant agrees that all materials containing or reflecting any such Discoveries and all Work Product shall be deemed to be work made for hire and shall be owned by the Belk Group (or its designee) without further consideration. If it is

5

determined that any such works are not works made for hire, such Participant hereby assigns to the applicable member of the Belk Group (or its designee) all of such Participant's right, title and interest, including all rights of copyright, patent and other intellectual property rights, to or in such Discoveries or Work Product. Such Participant covenants that such Participant shall keep the Company (or its designee) informed of the development of all Discoveries or Work Product that results, in whole or in part, from any work such Participant may do for, or at the request of, the Belk Group, whether alone or with others, or is related to the Belk Group's present or contemplated business activities, investigations or obligations. At the Company's (or its designee's) request and expense, such Participant shall execute any assignments or other documents necessary to transfer any such Discoveries or Work Product to the applicable member of the Belk Group (or its designee) and shall cooperate with the Company (or its designee) in perfecting the applicable member of the Belk Group's (or its designee's) title in such materials. To the extent any intellectual property rights in or to any Discoveries or Work Product made or conceived by such Participant are not transferred by operation of law or by this Plan, such Participant grants the applicable member of the Belk Group (or its designee) a permanent, exclusive, paid-up and worldwide license under such Participant's intellectual property rights in any Discoveries or Work Product, to use, have used, make, have made, sell, have sold, offer to sell or import such Discoveries and products and services based thereon relating thereto and reproduce in quantities, prepare derivative works and publicly display and distribute such Work Product.

(e) Pursuant to 18 U.S.C. § 1833(b), such Participant will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret of any member of the Belk Group that (i) is made (A) in confidence to a federal, state or local government official, either directly or indirectly, or to such Participant's attorney and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document that is filed under seal in a lawsuit or other proceeding. If such Participant files a lawsuit for retaliation by any member of the Belk Group for reporting a suspected violation of law, such Participant may disclose the trade secret to such Participant's attorney and use the trade secret information in the court proceeding, so long as such Participant files any document containing the trade secret under seal and does not disclose the trade secret except under court order. Nothing in this Plan is intended to conflict with 18 U.S.C. § 1833(b) or create liability for disclosures of trade secrets that are expressly allowed by such section.

6.2 <u>Non-Disparagement</u>. Such Participant shall not disparage, attempt to discredit, or otherwise call into disrepute, any member of the Belk Group or any of its Affiliates or any of their respective officers, directors, employees, equityholders, beneficiaries, members or partners.

6.3 <u>Non-Solicitation</u>.

(a) <u>Customers and Suppliers</u>. During the Participant's period of employment with, or Service to, the Belk Group and for the 12-month period immediately following the Termination thereof (the "<u>Restricted Period</u>"), such Participant shall not, directly or indirectly, on such Participant's own behalf or on behalf of any other Person (other than any member of the Belk Group its Subsidiaries), solicit or call upon any current, former or prospective customer or supplier of any member of the Belk Group (including any Person who was a customer or supplier of any member of the Belk Group during the one-year period preceding the date of such Participant's Termination) for the purpose of, or with the intention of, (i) selling or providing to such current, former or prospective customer any product or service substantially similar to any product or service sold, provided or under development by any member of the Belk Group or (ii) procuring services or products from such current, former or prospective supplier substantially similar to any services or products procured by any member of the Belk Group.

(b) <u>Employees and Other Service Providers</u>. During the Restricted Period, such Participant shall not, directly or indirectly, on such Participant's own behalf or on behalf of any other Person

6
Case 3:22-cv-00428-MOC-DSC   Document 1-2   Filed 08/22/22   Page 7 of 12

(other than any member of the Belk Group), solicit, recruit or hire, or attempt to solicit, recruit or hire, any individual who is at the time of, or was within the one-year period immediately preceding, such actual or attempted solicitation, recruitment or hiring, an employee, director, officer or individual consultant of or to any member of the Belk Group.

6.4  Non-Competition.  During the Restricted Period, such Participant will not work directly or indirectly in any capacity or perform any services (including as an officer, director, employee, agent, advisor, in any consulting capacity or as an independent contractor, as an owner or otherwise) of or for any Person, partnership, division, corporation or other entity that engages in the business of general merchandising anywhere in the United States of America and that generates at least $1,000,000,000 in annual revenues (herein, the "Business Competitors"). Such Participant engaging in the following activities will not be deemed to be in violation of this Section 6.4: (i) investment banking; (ii) passive ownership of less than 2% of any class of securities of a publicly traded company; or (iii) employment at a global or national consulting firm, so long as such Participant does not provide any consulting or other services to or for the benefit of any Business Competitor.

6.5  Reasonableness of Covenants. Such Participant has carefully read and considered all of the terms and conditions of this Plan, including the restraints imposed under this Article VI (the "Restrictive Covenants"). Such Participant agrees that the Restrictive Covenants are necessary for the reasonable and proper protection of the Belk Group and the Confidential Information and that each and every one of the Restrictive Covenants is reasonable in respect of subject matter, length of time and geographic area, and that the Restrictive Covenants, individually or in the aggregate, will not prevent such Participant from obtaining other suitable employment during the period in which such Participant is bound by the Restrictive Covenants. Such Participant acknowledges that each of the Restrictive Covenants has a unique, very substantial and immeasurable value to the Belk Group and that such Participant has sufficient assets and skills to provide a livelihood while the Restrictive Covenants remain in force. Such Participant shall not challenge the reasonableness or enforceability of any of the Restrictive Covenants and shall reimburse the members of the Belk Group for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the Restrictive Covenants if any member of the Belk Group prevails on any material issue involved in such dispute or if such Participant challenges the reasonableness or enforceability of any of the Restrictive Covenants. Each member of the Belk Group shall have the right to enforce all of such Participant's obligations under the Restrictive Covenants.

6.6  Reformation. If it is determined by a court of competent jurisdiction in any state that any Restrictive Covenant is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state, leaving the other provisions of the Plan intact.

6.7  Tolling. In the event of any Restrictive Covenant Breach, such restrictive covenant shall be extended by a period of time equal to the period of such violation.

6.8  Survival of Provisions. The Restrictive Covenants shall survive such Participant's Termination and shall be fully enforceable thereafter.

6.9  Equitable Relief and Other Remedies. Such Participant acknowledges and agrees that the remedies at law of the members of the Belk Group for a Restrictive Covenant Breach would be inadequate, and in recognition of this fact, such Participant agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the members of the Belk Group shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or

permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages or the posting of a bond or other security.

## ARTICLE VII
## OTHER PROVISIONS

7.1     <u>Administration</u>. The Administrator shall have the power and authority to prescribe, amend and rescind rules and procedures governing the administration of this Plan, including the full power and authority to: (a) interpret the terms of this Plan, any Participation Agreement, and the rules and procedures established by the Administrator governing this Plan, (b) determine the rights of any person under this Plan or the meaning of requirements imposed by the terms of this Plan or any rule or procedure established by the Administrator, (c) select the Participants under this Plan, (d) establish performance and vesting standards, (e) determine the amount of any Award, Bonus Amount, EBITDA, and Fair Market Value or other financial or non-financial metric, (f) impose such limitations, restrictions and conditions as it shall deem appropriate, (g) adopt, amend, and rescind administrative guidelines and other rules and regulations relating to this Plan, (h) correct any defect or omission, or reconcile any inconsistency, in this Plan and (i) make all other determinations and take all other actions necessary or advisable for the implementation and administration of this Plan, subject to such limitations as may be imposed by the Code or other applicable law. Each action of the Administrator (including each determination of the Administrator) shall be final, binding and conclusive on all persons. The Administrator may, to the extent permitted by applicable law, delegate any of its authority hereunder to any Person as it deems appropriate.

7.2     <u>Modifications</u>.

(a)     The existence of this Plan shall not affect in any way the right or power of any member of the Belk Group or their respective equityholder(s) to make or authorize, or any member of the Belk Group to undertake, (i) any change in their business, (ii) any merger or consolidation of any member of the Belk Group, (iii) any issuance of bonds, debentures or equity securities, (iv) any dissolution or liquidation, (v) any sale or transfer of all or part of their respective assets or business, or (vi) any other act or proceeding.

(b)     If there is a change in the business of the Belk Group (including, but not limited to, a merger, consolidation, disposition or acquisition of assets or line of business) that would distort the Company's intended magnitude of an Award and/or Bonus Amount, whether positively or negatively, the Administrator may in its sole discretion modify the terms, calculation or implementation of the terms and conditions of this Plan as it may determine in good faith to be necessary to reflect the intended magnitude of such amounts. Any such modification determined by the Administrator shall be final, binding and conclusive on each member of the Belk Group and all Participants and their respective heirs, executors, administrators, successors and permitted assigns.

(c)     Following payment of a Bonus Amount to a Participant, in the event that the performance of the Belk Group or the metrics on which either the Award or Bonus Amount was determined, either in whole or part, was based on erroneous information or the material noncompliance with any financial reporting requirement, the Administrator shall recalculate the Award or Bonus Amount of each Participant, and may require any Participant to forfeit any portion of the Award and/or Bonus Amount granted to the Participant under the Plan for the effected Plan Year, which amounts the Participant may also be required to repay to the Company.

7.3     <u>No Right to Continued Employment and/or Service</u>. Nothing in this Plan or in any Participation Agreement shall confer on any Participant any right to continue in the employment and/or Service of any member of the Belk Group or any of their Affiliates or interfere in any way with the right of

8

any member of the Belk Group or any of their Affiliates to terminate such Participant's employment and/or Service at any time for any reason or no reason or to continue such Participant's present (or any other) rate of compensation.

7.4     Indemnification. Neither the Administrator, nor any person to whom administrative or ministerial duties have been delegated, shall be personally liable for any action, interpretation or determination made with respect to this Plan, and the Administrator and any such person to whom administrative or ministerial duties have been delegated shall be fully indemnified and protected by the Company with respect to any liability such Person may incur with respect to any such action, interpretation or determination, to the maximum extent permitted by applicable law.

7.5     Termination and Amendment. The Administrator at any time may suspend or terminate this Plan and make such additions or amendments as the Administrator deems advisable under this Plan; provided that the Administrator may not change any of the terms of this Plan or a Participation Agreement in a manner that is materially adverse to such Participant's vested rights under this Plan as compared to the vested rights of all other Participants without the written consent of such Participant.

7.6     Severability. Whenever possible, each provision of this Plan shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Plan is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Plan shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

7.7     Prior Agreements. No provision of any employment, severance, incentive award or other agreement entered into by, or any term sheet distributed, exchanged or negotiated between, a Participant, on the one hand, and any member of the Belk Group or any of their Affiliates, on the other hand, prior to the Effective Date shall modify, or have any effect in any manner on, any provision of this Plan or any term or condition of any Participation Agreement to which such Participant is a party.

7.8     Construction. Unless otherwise expressly provided herein, the words "include," "includes" and "including" do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation." Where specific language is used to clarify by example a general statement contained herein (such as by using the words "such as"), such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates. Whenever required by the context, any pronoun used in this Plan shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

7.9     Section 409A Compliance. It is the intention of the Company and the Administrator that this Plan be exempt from or, in the alternative, comply with the provisions of Section 409A of the Code, as in effect as of the Effective Date or as subsequently modified. In the event that Section 409A would impose a detriment on the Participants, taken as a whole, then the Administrator shall consider in good faith modifications or amendments to this Plan intended to eliminate or ameliorate such detriment; provided that in no event shall the Administrator be required to modify or amend this Plan in a manner adverse to any member of the Belk Group. Notwithstanding any provision to the contrary, if pursuant to the provisions of Section 409A of the Code any payment is subject to Section 409A of the Code and required to be delayed as a result of a Participant being deemed to be a "specified employee" within the meaning of that term under Section 409A(a)(2)(B) of the Code, then any such payments under this Plan shall not be made or provided prior to the earlier of (A) the expiration of the six month period measured from the date of the Termination or (B) the date of the Participant's death. Upon the expiration of such period or the date of such Participant's death, as applicable, all payments under this Plan delayed pursuant to this Section 7.9 shall be paid to the

Participant (or the Participant's estate, as applicable) in a lump sum, and any remaining payments due under this Plan shall be paid or provided in accordance with the normal payment dates specified for such payments herein.

      7.10    <u>Unsecured and Unfunded Promise to Pay</u>. Neither the Participants nor their beneficiaries, heirs, successors or assigns have any legal or equitable right, claim or interest in any specific property or asset of any member of the Belk Group by reason of this Plan or any Participation Agreement. No assets of any member of the Belk Group shall be held in any way as collateral security for the obligations of the Company under this Plan. All of the assets of each member of the Belk Group shall be, and remain, the general, unpledged, unrestricted assets of each such member of the Belk Group. In the event any member of the Belk Group, in its sole discretion, decides to invest in any funds or assets, neither Participants nor their beneficiaries, heirs, successors or assigns shall have any rights in or to such investments. The Company's obligations under this Plan shall be merely unfunded and unsecured promises of the Company to pay money in the future, and the rights of the Participants and their beneficiaries, heirs, successors and assigns shall be no greater than those of unsecured general creditors of the Company. It is the intention of the Company that this Plan be unfunded for purposes of the Code.

      7.11    <u>Non-Transferability</u>. Except as to withholding of any tax under the laws of the United States or any state or locality, no benefit payable at any time under this Plan shall be subject in any manner to alienation, sale, transfer, assignment, pledge, attachment or other legal process or encumbrance of any kind. Any attempt to alienate, sell, transfer, assign, pledge or otherwise encumber any such benefits, whether currently or thereafter payable, shall be void. No person shall, in any manner, be liable for or subject to the debts or liabilities of any person entitled to such benefits. If any person shall attempt to, or shall, alienate, sell, transfer, assign, pledge or otherwise encumber benefits under this Plan, or if by any reason of the Participant's bankruptcy or other event happening at any time, such benefits would devolve upon any other person or would not be enjoyed by the person entitled thereto under this Plan, then the Company, in its discretion, may terminate the interest in any such benefits of the person entitled thereto under this Plan and hold or apply them to or for the benefit of such person entitled thereto under this Plan or such individual's spouse, children or other dependents, or any of them, in such manner as the Company may deem proper.

      7.12    <u>Governing Law and Choice of Forum</u>. Unless otherwise provided in a Participation Agreement, to the extent not preempted by federal law, the Plan, all Awards and each Participation Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to its principles of conflicts of laws. Except as otherwise provided in <u>Section 6.9</u>, to the fullest extent permitted by applicable law, any dispute, controversy or claim arising out of or relating to this Plan or any Participation Agreement or any Participant's rights or obligations hereunder or thereunder shall be settled by confidential arbitration in Charlotte, North Carolina in accordance with the Employment Arbitration Rules then obtaining of the American Arbitration Association. The arbitration proceedings and the results thereof shall be confidential and shall not be disclosed by either the Company or any Participant, except as required by law. The arbitrator's award shall be final and binding upon the Company and such Participant, and judgment upon the award may be entered in any court of competent jurisdiction in any state of the United States. If the parties to any such controversy are unable to agree upon a neutral arbitrator or arbitrators, then an arbitrator shall be appointed in accordance with such rules. For purposes of any actions or proceedings ancillary to the arbitration referenced above (for example, proceedings seeking interim relief in aid of the arbitration or to enforce an arbitration award), the parties consent to the non-exclusive jurisdiction of any state or federal court located in Charlotte, North Carolina. Each Participant agrees that any process or notice of motion or other application to either of such courts, and any paper in connection with any such arbitration, may be served by certified mail, return receipt requested, or by personal service or in such other manner as may be permissible under the rules of the applicable court or arbitration tribunal, provided a reasonable time for appearance is allowed.

\* \* \* \* \*